**180 Remsen LLC v St. Francis Coll.**

2026 NY Slip Op 30868(U)

March 3, 2026

Supreme Court, New York County

Docket Number: Index No. 653148/2023

Judge: Melissa A. Crane

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT: **HON. MELISSA A. CRANE**

*Justice*

| | PART | 60M |
|---|---|---|

-------------------------------------------------------------------------------X

180 REMSEN LLC,

Plaintiff,

- v -

ST. FRANCIS COLLEGE, ROCKROSE DEVELOPMENT LLC, RRDC PROPERTIES LLC, BK ACQUISITION THREE LLC,

Defendant.

-------------------------------------------------------------------------------X

| INDEX NO. | 653148/2023 |
|---|---|
| MOTION DATE | 05/19/2025 |
| MOTION SEQ. NO. | 015 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 015) 187, 188, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233, 234, 235, 236, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 247, 248, 249, 250, 251, 252, 253, 254, 255, 256, 257, 258, 259, 260, 261, 262, 263, 264, 265, 266, 267, 268, 269, 270, 271, 272, 273, 274, 275, 276, 277, 278, 279, 280, 281, 282, 283, 284, 285, 286, 287, 288, 289, 290, 291, 292, 293, 294, 312, 313, 314, 315, 316, 388, 389, 390, 391, 392, 393, 394, 395, 396, 397, 398, 399, 400, 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 419, 420, 421, 422, 423, 424, 425, 426, 427, 428, 429, 430, 431, 432, 433, 434, 435, 436, 437, 438, 439, 440, 441, 442, 443, 444, 445, 446, 447, 448, 449, 450, 451, 452, 453, 454, 455, 456, 457, 458, 459, 460, 461, 462, 463, 464, 465, 466, 467, 468, 469, 470, 471, 472, 473, 474, 475, 476, 477, 478, 479, 480, 481, 482, 483, 484, 485, 486, 487, 488, 489, 490, 491, 492, 493, 494, 495, 496, 497, 498, 499, 500, 501, 502, 503, 504, 505, 506, 507, 508, 509, 510, 511, 512, 513, 514, 515, 516, 517, 518, 519, 520, 521, 522, 523, 524, 525, 526, 527, 530, 531, 532, 533, 534, 535, 550, 577, 578, 583, 584, 585, 586, 587, 588, 589, 590, 591, 592, 593, 594, 595, 612, 613, 618, 619, 620, 621, 622, 623, 624

were read on this motion to/for                          JUDGMENT - SUMMARY                          .

This is an action against the ultimate buyer of property in Brooklyn. The main issue is whether or not plaintiff had a legitimate title objection.

Plaintiff contends it had a superior right to purchase the property and was ready, willing and able to do so. Plaintiff, 180 Remsen LLC (plaintiff or 180 Remsen), has already settled with the Seller, former defendant St. Francis College (the College). According to plaintiff, the College refused to provide it with the required title insurance, attempted to terminate the purchase and sale agreement, and then sold the Property to another buyer, defendant BK Acquisition Three LLC (BK

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No. 015

Page 1 of 44

1 of 44

Acquisition) that defendants Rockrose Development LLC and RRDC Properties LLC (collectively, Rockrose) created. Plaintiff further alleges that Rockrose usurped its right to purchase the Property in violation of a non-disclosure agreement (the NDA) that contained standard noncompete and no-contact provisions. Plaintiff also asserts that Rockrose intentionally induced the College to breach the purchase and sale agreement, including by misrepresenting the terms of the non-disclosure agreement.

Rockrose now moves, pursuant to CPLR 3212, for summary judgment dismissing the complaint as against it. For the reasons set forth below, the motion for summary judgment dismissing the complaint is denied, as there are multiple material issues of disputed fact.

**FACTS[1]**

**The College Puts its Main Campus on the Market**

Alexico Group (Alexico) is a real estate development company based in New York City that specializes in luxury condominium developments. Izak Senbahar (Senbahar) owns Alexico. Niso Bahar (Bahar) heads its finance and operations functions (Bahar dep [NYSCEF Doc No. 389], at 17:16-24, 18:8-24, 120:7-14; *see also* 6/30/25 Bahar affirmation [NYSCEF Doc No. 535], ¶ 1). 180 Remsen is an affiliate of Alexico.

The College is a non-profit college in Brooklyn, New York. A Board of Trustees runs the college, and appoints a president to function as the College's chief executive officer (*see* Board of Trustees by-laws [NYSCEF Doc No. 392]). In 2018, the College began to explore the possibility of selling its main campus located in Brooklyn Heights, consisting of five buildings located on three separate tax lots, with the addresses of 158-182 Remsen Street, 170 Joralemon Street, and

---

[1] The facts are taken from the complaint, the parties' submissions and the exhibits.

**653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL**                    **Page 2 of 44**
**Motion No.  015**

2 of 44

185 Joralemon Street, Brooklyn, NY 11201 (the Property). At the time, Dr. Miguel Martinez-Saenz (Martinez-Saenz) was the president of the College.

In September 2021, the College put the Property, where it had been located since the early 1960s, up for sale to facilitate a move to a new campus (*see* Verified Petition to New York Attorney General [NYAG] [NYSCEF Doc No. 393], at 3, 5). In July 2019, the College engaged the national real estate firm of Cushman & Wakefield, Inc. (Cushman) to market the Property. Daniel O'Brien (O'Brien) of Cushman led the marketing effort. In late 2021, he began soliciting bids, including from Alexico (O'Brien dep [NYSCEF Doc No. 203], at 21:21-23:18). During this process, potential buyers signed non-disclosure agreements, and had access to due diligence materials O'Brien provided, including information on setback restrictions applicable to the Property (*id*., at 103:5-10). Cushman provided Alexico with an offering memorandum and other due diligence materials (*see* NYSCEF Doc Nos. 394 [offering memorandum] and 395 [marketing book]).

The offering memorandum identified the Property as a five-building site located between Remsen Street and Joralemon Street (offering memorandum, at -617) that included three tax lots within block 255—lot 36 (running along Remsen Street) and lots 14 and 12 (running along Joralemon Street) (*id*. at -618-19). One of the buildings on Remsen Street is landmarked (*id*. at -619). Ultimately, the Board of the College selected Alexico as the winning bidder

**Alexico Discovers Errors Concerning A Setback Restriction**

Shortly after the College accepted the bid from Alexico, the parties began negotiating a purchase and sale agreement. When plaintiff discovered an error concerning the setback restriction on part of the property, the parties negotiated a reduced purchase price of $180M. According to plaintiff, in reviewing the title record for the Property and a 2010 Property Survey, Alexico, its transactional counsel, Milbank LLP (Milbank), along with its zoning and title counsel,

653148/2023    180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL                Page 3 of 44
Motion No.  015

3 of 44

Fried, Frank, Harris, Shriver & Jacobson LLP (Fried Frank) found that deeds for some portions of the Property on Remsen Street contained an eight-foot setback restriction (the Setback Restriction), while other areas along Remsen Street were not subject to a setback restriction (the Unrestricted Areas). Areas without a setback restriction could be developed (*see* 2/28/22 email from Bahar to Fried Frank's Melanie Meyers [NYSCEF Doc No. 402], at 426; 3/2/22 email from Meyers to Bahar [NYSCEF Doc No. 403], at -338; Bahar affirmation, ¶ 5). Indeed, the College had built its campus into one of the Unrestricted Areas (Bahar dep, at 193:22-25; *see* 2/28/22 email, at -426).

Plaintiff was also concerned that the Setback Restriction extended across the entirety of Remsen Street (*see* deposition of Milbank's Patricia Cleary [NYSCEF Doc No. 216], at 34:12-36:22). The cause for Plaintiff's concern was a 2010 survey of the Property that had a dashed line labelled "restriction line" running across at least part of Remsen Street, including some of the Unrestricted Areas (*see* 2/28/22 email, at -427). Initially, Alexico thought that the dashed line might mean there was a continuous setback restriction:

> "Per Milbank's email below there is an 8-foot front line set back restriction in the title. This issue was not known to us, and we first saw it as part of the Permitted Exceptions in the proposed PSA. We are currently waiting for the title document which shows the restriction ... and it looks like 8 feet of the buildings on the Remsen side will need to be taken out. I would like to discuss this new issue with you when you can"

(*see id*., at -426). In a telephone call on or around that same date, Bahar asked Meyers to investigate the nature and extent of the Setback Restriction (Meyers dep [NYSCEF Doc No. 217], at 19:4-16).

Plaintiff asserts that, by early April 2022, it determined there was no continuous setback restriction along Remsen Street for several reasons (Bahar affirmation, ¶ 6; Bahar dep, at 65:14-66:6). First, the College had built past the restriction line (Bahar dep, at 193:22-25). In addition, the survey's notes said that the dashed line was merely based on "old surveys," not deeds (*see*

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No.  015

Page 4 of 44

2/28/22 email, at -427). Another note said that "restrictions affecting ... parcel surveyed, if any, not shown" (*see id.*).

Alexico then consulted with the title insurer for the transaction, Fidelity National Title Insurance Company (Fidelity). Fidelity agreed that the Setback Restriction only affected part of the Property (Bahar dep, at 67:16-19; 4/14/22 email from Fidelity's Larry Boes to Cleary [NYSCEF Doc No. 410], at -110). Alexico asked Fidelity to have the surveyor show in an updated survey specifically those lots with setback restrictions (Bahar dep, at 67:16-19; Bahar affirmation, ¶ 9). On April 12, Fidelity provided Alexico with an updated survey of the Property (the March 2022 Survey) that identified those portions of Remsen Street subject to the Setback Restriction (*see* 4/12/22 email from Fidelity's Badema Pupovic to Cleary [NYSCEF Doc No. 411], at -917).

**180 Remsen and the College Enter into the PSA**

On April 8, 2022, 180 Alexico formed 180 Remsen to purchase the Property (Bahar dep, at 21:17-22; Bahar affirmation, ¶ 2). 180 Remsen's members are Senbahar, Bahar USA Development LLC (an entity Bahar solely owned), and Simon Elias (Elias), a real estate developer who has partnered with Senbahar and Bahar on other projects in the past (Bahar dep, at 21:11-13, 22:8-12; Elias dep [NYSCEF Doc No. 416], at 10:11-11:3, 48:3-5). 180 Remsen retained Alexico to provide property development services (Senbahar dep [NYSCEF Doc No. 417], at 25:8-12).

On April 22, 2022, 180 Remsen and the College executed a Purchase and Sale Agreement (the PSA [NYSCEF Doc No. 418]), memorializing 180 Remsen's commitment to purchase the Property for $180 million. The PSA provided for a scheduled closing date of September 30, 2022, with a two-installment deposit of $18 million. 180 Remsen had the right to extend closing up to 30 days (*id.*, § 2.5). The College could extend closing up to December 1, 2022 (*id.*, § 2.6). 180 Remsen paid an initial deposit of $5 million to an escrow agent within a day of signing, through a

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL          Page 5 of 44
Motion No.  015

5 of 44

personal loan from Elias (*id*., § 2.2; *see* Bahar dep, at 82:6-83:3; 4/25/22 email from John Thomas, Esquire, the College's real estate lawyer, to Cleary [NYSCEF Doc No. 419], at -518). 180 Remsen also agreed to pay an additional deposit of $13 million within 10 days of receipt of written notice that the NYAG had authorized the sale of the Property to 180 Remsen, subject to Supreme Court ratification "if applicable" (PSA, §§ 2.2, 7.8.2).

In the PSA, 180 Remsen stipulated to all recorded covenants and restrictions on the Property, including the Setback Restriction in certain recorded deeds:

> "Permitted Exceptions shall also include the following covenants, restrictions, conditions, easements and agreements of record: ... (ii) Covenants, restrictions and 8 foot front line set back restriction contained in deed recorded in Liber 259 Cp. 324, (iii) Covenants, restrictions and front line set back restrictions contained in deed recorded in Liber 462 Cp. 141, in deed recorded in Liber 725 Cp. 359, and in deed recorded in Liber 819 Cp. 430, (iv) Covenants, restrictions and 8 foot front line set back restriction contained in deed recorded in Liber 3330 Cp. 471"

(PSA, § 1.1).

180 Remsen also agreed that it would not object to any title issues that were included in the above definition of "Permitted Exceptions" or any matters shown on the survey attached as Exhibit J to the PSA (*id*., § 3.1.1 [a] ["Buyer shall have the right to object in writing to any title and Survey matters that appear on the Title Commitment (other than the Permitted Exceptions and matters shown on the survey provided to Buyer by Seller and attached hereto as Exhibit J]"). Although the survey did not identify recorded deeds reflecting the Setback Restriction for all lots fronting Remsen Street, that survey showed the Setback Restriction as a dotted line extending along the entire northern border of the Property along Remsen Street (*id*., § 3.1.1 [a]; *see* exhibit J]).

Upon signing the PSA, the College ceased negotiations with other potential buyers because the PSA prevented the College from negotiating or contracting with a back-up buyer (Martinez-

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No. 015

Page 6 of 44

6 of 44

Saenz dep, at 166:11-167:20). The College represented that it had "not entered into any agreements currently in effect pursuant to which Seller has granted any rights ... whereby any individual or entity has the right to purchase, lease or occupy all or any part of the Property" (PSA, § 6.2.5). As a condition to 180 Remsen's obligation to close, the College's representations had to remain true "as if made on and as of the Closing Date" (*id*., § 5.4 [c]). The College also covenanted not to take any action that would render its representations inaccurate (*id*., § 7.1.4 [i]). The College further agreed that it would not "engage in any activity or effect any transaction with respect to the Property which is outside of the normal course of business ... without [180 Remsen's] prior written consent (in its sole discretion)" (*id*., § 7.1.4 [c]).

**The PSA Gives 180 Remsen the Right to Title insurance on the Unrestricted Areas**

Pursuant to the PSA, **a condition precedent to 180 Remsen's obligation to close was the receipt of a title policy that insured title to the Unrestricted Areas**. 180 Remsen was entitled to receive a title policy at closing from Fidelity that was limited only by specified "Permitted Exceptions" (*id*., §§ 3.1.2, 5.4 [a]). The Permitted Exceptions listed the deeds that imposed Setback Restriction on the Restricted Areas, <u>but did not include any exceptions for setbacks on the Unrestricted Areas</u> (*id*., Article 1 - Certain Definitions, Permitted Exceptions). The Permitted Exceptions also incorporated title matters reflected on a survey of the Property (*id*., § 3.1.1 [a]). The survey, like the one 180 Remsen had found before signing the PSA, had a dashed "restriction line" running across at least part of Remsen Street (and at least one of the Unrestricted Areas), but the survey said the dashed line was based on "old surveys," not on documents in the title record, and that any "restrictions affecting" the Property were "not shown (*id*. at -049-52). The survey also reflected that the College had built past the dashed line (*id*. at -52). The PSA included a procedure

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL          Page 7 of 44
Motion No.  015

7 of 44

[* 7]

for 180 Remsen to object to title or survey matters that appeared in Fidelity's title commitment after signing (*id*., § 3.1.1).

As a result, according to plaintiff, its understanding of the PSA is that it gave 180 Remsen the right to receive title insurance at closing that insured title to the Unrestricted Areas (Bahar affirmation, ¶ 13).

**180 Remsen Continues Assessing the Setback Restriction**

After signing the PSA, 180 Remsen continued to work with Fried Frank to determine whether it should pursue a quiet title action regarding the Setback Restriction (Bahar dep, at 78:24-79:17; *see* 4/25/22 email from Bahar to Fried Frank's Ben Paull [NYSCEF Doc No. 420], at -652-53; Bahar affirmation, ¶ 15). Fried Frank worked with Fidelity on the matter (*see* 4/25/22 email, at 652; 6/16/22 email from Paull to Bahar [NYSCEF Doc No. 421], at -122).

On July 26, 2022, Fried Frank communicated its initial findings (the First Fried Frank Memo [NYSCEF Doc No. 404]). Fried Frank recommended a declaratory judgment action to terminate the Setback Restriction (*id*. at -980_0003) and concluded the Unrestricted areas were not subject to any setback restrictions (*id*. at -980_0002 ["The majority of the frontage along Remsen Street is burdened by setback restrictions with the exception of a portion of former lot 32, a portion of former old lot 36 and former lot 42"]). Fried Frank made clear that its findings in the July 2022 Memorandum were preliminary and that additional title research could help clarify (*id*.).

**180 Remsen Begins Soliciting Lenders and Investors**

In May 2022, 180 Remsen had engaged Avison as its broker to lead the process of finding potential lenders and investors for its purchase and development of the Property (*see* 5/25/22 engagement letter [NYSCEF Doc No. 423], at -825-26; Bahar dep, at 85:17-86:1). Plaintiff alleges that, by November 2022, Avison had contacted 96 potential equity investors and 80 potential

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL                                                Page 8 of 44
Motion No. 015

[* 8]                                                                        8 of 44

lenders, with both The Goldman Sachs Group, Inc. (Goldman Sachs) and JPMorgan Chase & Co. (JPMorgan) expressing interest (*see* 11/16/22 email from Avison's Scott Singer to Bahar [NYSCEF Doc No. 429], at -894-97).

**The College and 180 Remsen Each Extend the Scheduled Closing Date and Amend the PSA**

On September 16, 2022, the NYAG approved the sale. This triggered 180 Remsen's obligation to fund a $13 million second deposit by October 3, 2022 (*id.*, § 2.2; *see* NYAG approval [NYSCEF Doc No. 194]).

On September 30, 2022, 180 Remsen advised the College it would not fund the additional deposit, because the College had not also obtained an order from Supreme Court, Kings County, approving the sale (Martinez-Saenz dep, at 192:22-193:8). Defendants claim this was a contrived objection to mask that 180 Remsen did not have the funding (*see* Bahar dep, at 123:17-20).

On October 31, 2022, the parties entered into the First Amendment to the PSA (NYSCEF Doc No. 246), in which 180 Remsen agreed to abandon its insistence on Supreme Court approval in exchange for a reduction in the second deposit amount from $13 million to $5 million (Bahar dep, at 99:13-24, 102:21-103:22). The Scheduled Closing Date remained December 1, 2022 (Senbahar dep, at 230:13-21). Elias took out a personal loan to fund the second deposit (Bahar dep, at 140:22-144:21; *see also* Senbahar dep, at 233:20-235:24).

On November 23, 2022, 180 Remsen exercised its right under section 2.5 of the PSA to extend the closing date from December 1, 2022 to January 3, 2023 to allow more time to obtain financing for its purchase of the Property (*see* 11/23/22 email from Cleary to Thomas and Dryer [NYSCEF Doc No. 432], at -678-79; PSA § 2.5). According to plaintiff, interest rates were high due to post-pandemic inflation, and it did not want to bind itself to unusually expensive financing

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No. 015

Page 9 of 44

9 of 44

terms (*see* Bahar dep, at 182:5-7, 182:21-185:1; 9/19/22 email from Andy Singer to Bahar [NYSCEF Doc No. 434], at -043; Bahar affirmation, ¶ 20).

**180 Remsen and Rockrose Enter Into the NDA**

In November 2022, Avison contacted Rockrose, a real estate developer focused on residential rental projects, to solicit its interest in investing in 180 Remsen's purchase of the Property. Its main principals are Henry Elghanayan and his son, Justin Elghanayan. Its chief operating officer is Richard Brancato (Brancato) (*see* 10/10/22 email from Andy Singer to Brancato [NTYSCEF Doc No. 437]; Brancato dep [NYSCEF Doc No. 247], at 61:4-63:3; *see also* Brancato affirmation [NYSCEF Doc No. 289]). In its outreach email, Avison attached a draft non-disclosure agreement that 180 Remsen required potential investors and lenders to execute before receiving the offering memoranda and other materials about 180 Remsen's plans.

On November 15, 2022, RRDC Properties L.L.C. (RRDC), an entity affiliated with Rockrose, executed the NDA (NYSCEF Doc No. 441). The NDA provided that 180 Remsen may provide RRDC with non-public materials and information (defined as Evaluation Material) about 180 Remsen's planned purchase of the Property (defined as the Transaction) (*id*. at 252). In exchange, RRDC made several commitments.

In paragraph (1) of the NDA, RRDC agreed that it would use the Evaluation Material "solely for the purpose of evaluating the Transaction and such Evaluation Material will be kept confidential" (*id*. at 252). RRDC was permitted to share the Evaluation Material with its affiliates and employees only to evaluate the Transaction (*id*.). In the first clause of paragraph (2), RRDC agreed not to "discuss the Transaction with or contact any entity, tenant, seller, servicer, investor, partner, ground lessor or agent for the Transaction without the prior written consent of [180 Remsen] which may be withheld in [180 Remsen's] sole and absolute discretion" (*id*.). In the

**653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL**
**Motion No. 015**

**Page 10 of 44**

10 of 44

second clause of paragraph (2), RRDC agreed not to "enter into any discussions, negotiations, agreements, arrangements or understandings (whether written or oral) with any other person regarding the Transaction, other than [180 Remsen] for a period of eighteen months from the date of this Agreement" (*id*. at 252-53).

The same day that the NDA was executed, Avison sent RRDC the confidential offering memorandum and a link to the data room containing Evaluation Material, including financial models, massing proposals, construction and design materials, among other things (*see* NYSCEF Doc No. 442, at -256; NYSCEF Doc No. 443, at -694; NYSCEF Doc No. 444, at -698; NYSCEF Doc No. 445, at -113; NYSCEF Doc No. 446, at -958; NYSCEF Doc No. 447, at -752-99; NYSCEF Doc No. 448, at -823-78).   Rockrose promptly accessed the data room (Brancato dep, at 142:15-144:5).   Ultimately, plaintiff and Rockrose had different visions for the property and decided not to work together.

**Fried Frank Temporarily Modifies Its Opinion on the Unrestricted Areas**

On November 23, 2022, Frank issued an updated memorandum that modified its original conclusions about the scope of the Setback Restriction (the Second Fried Frank Memo [NYSCEF Doc No. 452]).   Fried Frank had discovered an indenture agreement recorded under a lot next to the Property from the 1850s that purported to impose an eight-foot setback along Remsen Street, including the Unrestricted Areas (*see id*., ¶ 36 ["Remsen Street is burdened by an eight (8) foot building setback restriction in its entirety as evidenced by the Indenture"]).   Based on its findings, Fried Frank recommended that, "in order to terminate the setback restriction ... an action would have to be commenced seeking a declaratory judgment to extinguish the restriction" (*id*., ¶ 4).

180 Remsen asserts that it was alarmed by the change in Fried Frank's analysis because it was inconsistent with the PSA. It was also worried about the indenture's effect on its ability to

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No.  015

Page 11 of 44

11 of 44

obtain title insurance and build on the Unrestricted Areas, that had been part of its design plans (*see* 12/17/22 email from Bahar to Fried Frank's Rebecca Martin [NYSCEF Doc No. 453], at 885, - 885_0002; Bahar affirmation, ¶¶ 19, 27). On the same day that it received the Second Fried Frank Memo, 180 Remsen exercised its right under the PSA to extend the closing date to January 3, 2023 (Bahar dep, at 234:16-243:8; Senbahar dep, at 270:17-271:4).

**180 Remsen and the College Extend the Scheduled Closing**
**Date to March 30, 2023 and Enter into the PSA Second Amendment**

Plaintiff asserts that, in December 2022, as the January 3, 2023 Scheduled Closing Date approached, it determined that it needed additional time to secure financing, given the still uncertain state of the lending market (Bahar dep, at 182:1-184:16; Bahar affirmation, ¶ 21). Plaintiff asserts that the College was amenable to an extension, but because it had a regulatory audit report due to the U.S. Department of Education on **March 30, 2023**, it would not agree to extend the deadline beyond that date (*see* 12/29/22 email from Kevin O'Shea to Thomas [NYSCEF Doc No. 458]).

Thus, on December 30, 2022, the parties executed another amendment to the PSA memorializing their agreement (the PSA Second Amendment [NYSCEF Doc No. 458]). Section 1 of the PSA Second Amendment provided that "[t]he Scheduled Closing Date is hereby extended to March 30, 2023, **time being of the essence** with regard to Buyer's obligation to close on or before such date" (PSA Second Amendment, § 1). In exchange for the extension of the closing date, 180 Remsen agreed to the release to the College of $2.5 million per month from the escrowed deposit amounts for its operations (*id.*, §2; *see also* Bahar dep, at 182:21-183:23; Martinez-Saenz dep, at 265:25-267:22).

The PSA Second Amendment also included terms concerning the title commitment for the Property, pursuant to which 180 Remsen acknowledged its "satisfactory review" of a December

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No. 015

Page 12 of 44

12 of 44

[* 12]

30, 2022 pro forma (NYSCEF Doc No. 459) Fidelity circulated, and the March 28, 2022 survey of the Property, PSA Second Amendment, § 3. The pro forma, a preview of Fidelity's title policy, listed exceptions to title insurance in Schedule B, exceptions to title insurance (*Id.*, pro forma, schedule B, at 845-46). The Second Amendment provided that the exceptions listed in that pro forma would be deemed Permitted Exceptions under the PSA Second Amendment, § 3. The PSA Second Amendment also gave 180 Remsen the right to object to new title matters appearing on a "title commitment" (a written commitment by Fidelity to provide a specified title policy at closing) subsequent to the version circulated on November 21, 2022 (or any survey matters that appear after the March 28, 2022 survey) (*id.*). Schedule B to the November 21, 2022 title commitment was similar to Schedule B to the December 30, 2022 pro forma, except that the November title commitment had text stating that its description of the survey (which was also the March 28, 2022 survey) was "for information only" and that a "signed and sealed survey is required" (Fidelity Preliminary Certificate and Report of Title [NYSCEF Doc No. 460], at -327 [capitalization removed]).

Schedule B to the December 30, 2022 pro forma did not have any exceptions for the Unrestricted Areas. Schedule B identified deeds with setback restrictions on the Restricted Areas, but not the Unrestricted Areas (*see* pro forma, at -845-46). Schedule B also described exceptions appearing in the survey, and there was no description of a continuous setback restriction on Remsen Street (even though the survey had the dashed line running across some of Remsen Street) (*see id.*). To the contrary, the March 28, 2022 survey had notes saying that the dashed line was not based on the title record and that the survey did not reflect any restrictions on the Property. The survey also identified the Setback Restriction with page and liber numbers, which did not appear on the Unrestricted Areas (*see* 3/8/22 survey [NYSCEF Doc No. 411], at -917).

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL                                    Page 13 of 44
Motion No. 015

13 of 44

**Rockrose Contracts with the College to**
**Purchase the Property and Enter into the Backup PSA**

As set forth below, both parties have sharply conflicting interpretations of the events leading up to Rockrose's purchase of the Property from the College.

### 1. Rockrose's Version of the Facts

According to Rockrose, as the March closing date approached, the College grew increasingly concerned about 180 Remsen's ability to close on the transaction. For instance, in February 2023, its counsel reminded 180 Remsen that "the College must file its FY22 audited financial statements with the U.S. Dept. of Education no later than March 30th with no extension permitted. The closing on the Remsen Street property must take place on or before that deadline in order for the College to avoid potentially significant consequences" (*see* 2/16/23 email from Kevin McDonough, Esq. to Cleary [NYSCEF Doc No. 261]).

A few days before closing, Cecere, the College's chief operating officer at the time, held a telephone conference with 180 Remsen's principals to inform them that the College intended to proceed with the closing on March 30, 2023. Cecere testified that, during that call, 180 Remsen's principals "expressed to us [the College] at that point, I think fairly clearly, that they didn't have the necessary funds to close" (Cecere dep, at 280:17-284:6). Rockrose contends that, at no time in the weeks prior to the closing did 180 Remsen raise any issue with the College concerning the Setback Restriction, even after it received updated reports from Fried Frank (*see* Senbahar dep, at 343:1-344:2).

Meanwhile, in late February 2023, the College, through its real estate broker, O'Brien of Cushman, had begun contacting potential back-up buyers (O'Brien dep [NYSCEF Doc No. 203], at 92:8-19, 97:21-98:8; Martinez-Saenz dep, at 270:12-276:9). Through O'Brien, the College

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No. 015

Page 14 of 44

14 of 44

ultimately had a conversation with Elghanayan regarding his interest in acting as a potential backup buyer (*see* Martinez-Saenz dep, at 289:2-17).

Subsequently, BK Acquisition was created on March 8, 2023, for the purpose of entering into a backup transaction for the Property (Brancato affirmation, ¶ 14). On March 29, 2023, one day prior to the March 30, 2023 Scheduled Closing Date, the College executed a backup purchase and sale agreement with BK Acquisition (the Backup PSA [NYSCEF Doc No. 293). According to Rockrose, the College insisted that the parties sign the Backup PSA on March 29, 2023, so that it could obtain approval of the transaction from the NYAG (*see* Elghanayan dep, at 111:12-113:4).

The Backup PSA was expressly "made subject to and conditioned upon the failure of [180 Remsen] to purchase the Property on the Existing Contract Closing Date pursuant to the terms and conditions of the Existing Contract" (Backup PSA, § 10.15 [a]). It further provided that "[i]f the Property is sold on the Existing Contract Closing Date in accordance with the terms and conditions of the Existing Contract, this Agreement shall be deemed to be terminated and Escrow Agent shall promptly return the Deposit to [BK Acquisition] and, thereafter, the Parties shall have no further rights or, obligations hereunder" (*id.,* § 10.15 [b]).

In the Backup PSA, the College also represented that:

"[The College] has heretofore extended the Closing date under the Existing Contract to March 30, 2023 (the "Existing Contract Closing Date"), with time being of the essence as to [180 Remsen's] obligation to close on such date. Seller does not anticipate that [180 Remsen] will be able to close under the Existing Contract on the Existing Contract Closing Date. Prior to entering into, and independent of, its negotiations with [BK Acquisition], [the College] had decided not to further extend the Existing Contract Closing Date, or otherwise modify or amend, or waive any of the terms and conditions of, or any default under, the Existing Contract"

(*id*., at Recital 1). The College further represented that:

"The Existing Contract does not prohibit [the College] from entering into this Agreement. Prior to entering into negotiations with [BK Acquisition] for the sale of the Property, [the College] has disclosed, to [180 Remsen] that [the College] may

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No.  015

Page 15 of 44

15 of 44

pursue backup contracts for the sale of the Property in case the closing under the Existing Contract does not occur on the Existing Contract Closing Date. A copy of the Existing Contract has not been made available to [BK Acquisition] by [the College]"

(*id*., § 6.2.19).

Rockrose asserts that BK Acquisition relied on the College's representations because, as memorialized in the Backup PSA, it did not receive a copy of or review the original PSA (Brancato affirmation, ¶ 17; Elghanayan dep, at 139:10-141:3).

## 2. Plaintiff's Version of the Facts

According to plaintiff, in February 2023, Rockrose was well underway developing plans to purchase the entire site itself and used 180 Remsen's confidential materials to do so. For instance, Rockrose used 180 Remsen's zoning and massing analyses to assess whether it could increase the buildable area in the Property (*see* 2/17/23 email from Elghanayan to Januszewski [NYSCEF Doc No. 465], at -870; 2/17/23 email from Elghanayan to S. Singer [NYSCEF Doc No. 466], at -891). Plaintiff asserts that Rockrose also used 180 Remsen's financial models to prepare its own profit valuations. These valuations assumed the Property would be developed as an all-rental site, a scenario that would only occur if 180 Remsen was sidelined from the deal (*see* 2/23/23 email from J. Lerro to H. Elghanayan [NYSCEF Doc No. 467], at 980; 2/26/23 email from A. McNulty to Brancato [NYSCEF Doc No. 468], at -653; Elghanayan dep, at 102:15-104:17). Plaintiff further asserts that Rockrose supported these analyses with newly acquired information it requested and received from 180 Remsen about the Property (*see* 2/17/23 emails).

In late February 2023, just days after the tour, Elghanayan called a broker from Cushman to pitch him on the idea of Rockrose purchasing the Property (Elghanayan dep, at 105:10-106:4; Brancato dep, at 194:21-195:17). Plaintiff claims that no one at Rockrose informed 180 Remsen

that the College and Rockrose were beginning direct discussions (Elghanayan dep, at 125:22-126:8; Bahar dep, at 277:6-10).

Cushman then organized a meeting between Elghanayan and Martinez-Saenz on March 6, 2023 to discuss a deal between the two parties (*see* 3/6/23 meeting invite from O'Brien to Elghanayan and Martinez-Saenz [NYSCEF Doc No. 463], at -071; *see also* Elghanayan's handwritten meeting notes [NYSCEF Doc No. 464], at -917-18). During the meeting, Elghanayan offered to purchase the Property for **$160** million (Elghanayan dep, at 117:6-121:12; Martinez-Saenz dep, at 298:22-301:24). Elghanayan discussed the NDA, but did not share a copy with the College, and represented that it did not prevent Rockrose from purchasing the Property (Elghanayan dep, at 160:4-16; Martinez-Saenz dep, at 305:25-306:170). After the call, Elghanayan sent Martinez-Saenz a letter with proposed terms for Rockrose's purchase of the Property (*see* 3/6/23 email from Elghanayan to Martinez-Saenz [NYSCEF Doc No. 469], at -516-19). The letter included the $160 million purchase price with a closing date of March 31, 2023, and noted that "time [was] of the essence as to Buyer" (not the seller) (*id*. at -518).

The Board and Cecere considered the offer (*see* 3/7/23 email from Cecere to C. Good [NYSCEF Doc No. 470], at -944-45). Cecere had effectively replaced Martinez-Saenz, who was in the process of resigning (Martinez-Saenz dep, at 273:8-13, 279:6-17, 286:24-287:24; Cecere dep [NYSCEF Doc No. 471], at 211:21-212:23; 3/5/23 email from Dryer to O'Brien with subject line: Backup Bid – Rockrose [NYSCEF Doc No. 472], at -323.).

Later that day, the Board permitted the College to begin negotiating an agreement with Rockrose (*see* 3/6/23 email from Elghanayan to O'Brien and Martinez-Saenz [NYSCEF Doc No. 473], at -087). Two days later, on March 8, 2023, Rockrose set up a new entity, defendant BK

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No.  015

Page 17 of 44

17 of 44

Acquisition, to purchase the Property (*see* corporate filing receipt [NYSCEF Doc No. 474], at -027).

On March 29, 2023, the College and BK Acquisition executed the Backup PSA. This document included the representations that the College had already decided not to negotiate further with 180 Remsen and that the PSA permitted entry into the Backup PSA (*see* Backup PSA, § 6.2.19). It also included indemnification and escrow provisions Rockrose wanted (*id.*, §§ 6.3, 10.15 [f]), as well as the provisions that prevented the College from further negotiating with 180 Remsen (*id.*, § 7.1.4 [j]). It also required that the College terminate the PSA by first thing on March 31 if the deal had not yet closed.

Plaintiff contends that, as the scheduled closing date neared, it was kept in the dark about the College's direct negotiations with Rockrose, and thus, continued its preparations for closing (Bahar dep, at 224:11-19; Cecere dep, at 282:14-16). 180 Remsen alleges that, in conjunction with Avison, it worked aggressively to secure financing for its purchase of the Property by the scheduled closing date, and imparted its sense of urgency to Avison (*see* 2/15/23 email from Andy Singer to Elias [NYSCEF Doc No. 481], at -981-82). 180 Remsen further alleges that Avison was in discussions with several financing sources, including Goldman Sachs, G4 Capital Partners, and JPMorgan, each of whom had provided terms for an anticipated investment (*see* emails regarding financing [NYSCEF Doc Nos. 482-487]). Plaintiff asserts that, by late March 2023, it was positioned to finalize terms for closing by the March 30 closing date (Bahar dep, at 219:4-22, 233:18-22; Singer dep [NYSCEF Doc No. 433], at 141:22-142:13, 143:17-145:14; Senbahar dep, at 356:1-19; O'Shea dep [NYSCEF Doc No. 488], 60:14-16).

According to Scott Singer, 180 Remsen's broker from Avison Young (who also has a longstanding relationship with Rockrose), 180 Remsen could have finalized a deal with the

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No. 015

Page 18 of 44

18 of 44

institutional lenders in as little as one day by simply compromising on financing terms (Singer dep, at 141:22-142:13; 143:17-145:14, 157:25-158:4; Senbahar dep, at 115:24-116:22, 356:1-357:18; Brancato dep, at 63:4-11). Plaintiff further alleges that Elias, a member of 180 Remsen who operates his own investment firm, was prepared to contribute up to an additional $25 million toward closing (Elias dep [NYSCEF Doc No. 416], at 39:12-14; *see also* Elias bank account statements [NYSCEF Doc Nos. 489-490).

On March 25, 2023, the College raised again the issue of the DOE deadline, now claiming that it was a "near certainty" that the College would be "closing its doors" if 180 Remsen did not complete the transaction by March 30 (*see* 3/27/23 email from Cleary to Bahar [NYSCEF Doc No. 494], at -832). Between that date and March 30, the parties and counsel held several meetings discussing plans for closing (*id*. at -830). In documenting those meetings, the College's counsel claimed that 180 Remsen's counsel affirmed that Alexico was "not in a financial position" to buy the Property (*id*.). However, plaintiff contends that neither its counsel nor principals ever said that they were unable to close on March 30 (O'Shea dep, at 54:7-22, 58:8-12; Bahar affirmation, ¶ 33).

**The Final Fried Frank Memo**

In preparation for closing, 180 Remsen had been pushing Fried Frank to complete its analysis of whether the indenture identified in the Fried Frank Second Memo affected the Unrestricted Areas (*see* 2/7/23 email from Bahar to Fried Frank's Ellen Kresback [NYSCEF Doc No. 491], at -039; 2/7/23 email from Kresback to Senbahar [NYSCEF Doc No. 455], at -050). On March 10, 2023, Fried Frank issued a third memorandum with its final findings (the Third Fried Frank Memo), and supplemented its materials on March 14, 2023 (*see* NYSCEF Doc No. 456).

According to plaintiff, the memorandum confirmed that Fried Frank's initial finding was correct, i.e., that the Unrestricted Areas were unaffected by the Setback Restriction (*id*. at -

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No. 015

Page 19 of 44

19 of 44

220_0004 ["the three (3) lots which were shown earlier [in the First Fried Frank Memo] to not be subject to the setback requirement, namely lot 42, part of lot 32 and part of lot 36, were not burdened by the restrictions as per the original examination"]). Fried Frank's conclusion was based on newly uncovered records showing that title to the Unrestricted Areas passed to new owners before the indenture was executed (*id.* at -220_0004-05). Fried Frank also noted that, however, "the balance of land comprising lot 32 and 36, are restricted by the setback covenants" (*id.*).

Plaintiff contends that, after receiving the Third Fried Frank Memo and discussing its findings with Fried Frank, it contacted Fidelity to confirm that its understanding of the Setback Restriction comported with Fried Frank's (*id.*, ¶ 28).

**180 Remsen Raises a Title Objection Under the PSA**

On March 29, Fidelity issued an amended title commitment reflecting its view that the Setback Restriction was continuous across Remsen Street and would be an exception to the title policy (*see* 3/29/23 email from Boes to Cleary [NYSCEF Doc No. 501], at -506-07).

That day, 180 Remsen sent a letter to the College raising a title objection under Section 3.1.1 of the PSA (*see* 3/29/23 email from Cleary to Dryer [NYSCEF Doc No. 502], at -130). The letter explained that Fidelity's position was inconsistent with the permissible "restrictions set forth in the [PSA]," and that the survey reflected, consistent with the title record, that the Setback Restriction did not apply to the Unrestricted Areas (*id.* -130-31).

Under Section 3.1.1 of the PSA, in response to 180 Remsen's title objection, the College was permitted to "elect ... to Remove or cause to be Removed any such exceptions to title" by "notify[ing] [180 Remsen] in writing" within a week of receiving notice of the title objection "but, in any event, prior to the Scheduled Closing Date" (PSA, § 3.1.1 [b]). Removing an exception

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No.  015

Page 20 of 44

20 of 44

meant the College would have to have "cause[d] the Title Company to remove of record or affirmatively insure over the same" (*id*., [definition of "Remove"]). If the College did not respond in writing, the non-response would be "deemed an election by Seller to not Remove such title objections" (*id*., § 3.1.1 [b]). If the College elected not to Remove the basis for a title objection, then 180 Remsen would have the option to terminate the PSA and recover its deposit or waive the title objection and proceed to closing (*id*.)

The next morning, Fidelity issued a revised title commitment (the March 30 Title Commitment [NYSCEF Doc No. 503]). The College then responded to the title objection, asking 180 Remsen to "[p]lease confirm by return email that you withdraw your title objection letter from last night" (*see* 3/30/23 email from Thomas to Cleary [NYSCEF Doc No. 504], at -739). The College's response did not elect to Remove or not Remove the basis for the objection, because Fidelity had only resolved part of the issue. According to plaintiff, 180 Remsen's objection was based on Fidelity's incorrect position that, based on the survey, the Setback Restriction ran continuously across Remsen Street (*see* 3/29/23 email from Cleary to Dryer [NYSCEF Doc No. 502], at -130).

On March 30, 2023, at 2:46 pm, 180 Remsen contacted Fidelity to explain that the title commitment remained problematic (*see* 3/30/23 email from Cleary to Boies [NYSCEF Doc No. 505], at -794). 180 Remsen reattached the annotated survey and explained that, to resolve the ambiguity in the title commitment, Fidelity would need to "affirmatively indicate that there are no restrictions on" the Unrestricted Areas, which would "Remove" the basis for 180 Remsen's objection under the PSA's definition (*id*.). Shortly after, 180 Remsen forwarded the message to the College (*see* 3/30/23 email from Cleary to Thomas [NYSCEF Doc No. 506], at -790).

**653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL**
**Motion No.  015**

**Page 21 of 44**

21 of 44

Fidelity responded at 3:58pm (*see* 3/30/23 email from Ed Heim of Fidelity to Cleary and Boies [NYSCEF Doc No. 505], at -794). In its response, Fidelity acknowledged that the annotated survey suggested that there was no continuous Setback Restriction on the Unrestricted Areas (*id*. at -794). Fidelity said it was going to work with the surveyor to understand the conflict and then "consider amending Schedule B" (*id*.). 180 Remsen contends that it did not hear from Fidelity or the College any further that day (March 30) (Bahar affirmation, ¶ 31).

Rockrose contends that, despite the back and forth about the title objection, the College was ready, willing, and able to close on March 30, 2023, and had delivered to Fidelity, the escrow agent, all items necessary for closing, but that on that date, 180 Remsen had not lined up the financing necessary to purchase the Property (*see* Singer dep, at 105:23-109:12, 138:15-139:18; Bahar dep, at 218:22-220:10, 233:1-22; Cleary dep, at 81:4-82:12; O'Shea dep, at 67:24-68:10). Rockrose further contends that, on March 30, 2023, 180 Remsen did not provide any of its closing deliverables to the escrow agent (*see* Senbahar dep, at 63:7-12).

On March 31, 2023, at 3:19 p.m., the College notified 180 Remsen by letter that it was terminating the PSA (as required under the BK PSA) (*see* NYSCEF Doc No. 507, at -133 ["Purchaser failed to deliver the Purchase Price and closing did not occur on March 30, 2023" and thus, "(p)ursuant to Section 8.1 of the (PSA), Seller hereby elects to terminate the (PSA)"; *see* PSA, §§ 7.1.4 [j], 10.15[c]).

In response, citing Section 3.1.2 of the PSA, 180 Remsen demanded that Fidelity provide affirmative insurance over the Setback Restriction (*see* 3/31/23 letter from O'Shea to Dryer [NYSCEF Doc No. 282] ["The conditions precedent to Buyer's obligation to close were not satisfied because, as of the Scheduled Closing Date, the Title Company was unable or unwilling to issue a Title Policy at the Closing (as required by Section 3.1.2 of the Purchase Agreement) that

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No. 015

Page 22 of 44

22 of 44

satisfactorily addresses Buyer's timely objected-to title objections"]).  180 Remsen stated that it remained committed to working with the College and the title company to address the title ambiguity and then proceeding "expeditiously" to close the transaction (*see* 3/31/23 email from Cleary to Thomas and Dryer [NYSCEF Doc No. 508], at -145-46).

Defendant asserts that, however, Section 3.1.2 of the PSA does not require that Fidelity provide affirmative insurance and, was not a basis for 180 Remsen to demand that the College extend the Closing Date (*see* PSA, § 3.1.2 [providing that although Buyer could request endorsements at closing, "Buyer's obligations under this Agreement shall not be conditioned upon Buyer's ability to obtain such endorsements and, if Buyer is unable to obtain such endorsements, Buyer shall nevertheless be obligated to proceed to close the Transaction without reduction of or set-off against the Purchase Price, and ... the Closing shall not be delayed as a result of Buyer's request"]).

Although plaintiff contends that Rockrose was aware of 180 Remsen's pending title objection (*see* Elghanayan dep, at 175:11-21), Rockrose contends that plaintiff manufactured this title objection on the eve of closing, and that, at no time between the signing of the Second Amendment and March 2023 did 180 Remsen give the College any indication of concerns regarding the Property's title (*see* Senbahar dep, at 231:9-232:4, 349:5-19).

**The College Sells the Property to BK Acquisition**

After 180 Remsen failed to close and the College terminated the PSA, the College and BK Acquisition closed on March 31, 2023, pursuant to the terms of the Backup PSA (*see* closing documents [NYSCEF Doc No. 509], at -928).  Since purchasing the Property, BK Acquisition has demolished all of the existing non-landmarked buildings on the site, has submitted and received approval of foundation plans from the New York Department of Buildings, and is executing on

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No.  015

Page 23 of 44

23 of 44

design plans that the New York Landmarks Preservation has approved, but has not otherwise built on the site Commission (Brancato affirmation, ¶ 18). Elghanayan testified that Rockrose's position is that there is no continuous setback restriction affecting the Property (Elghanayan dep, at 199:2-24).

**Relevant Procedural History**

Plaintiff brought this action against Rockrose and the College on June 29, 2023, seeking conveyance of the Property or, in the alternative, damages (*see* complaint [NYSCEF Doc No. 1]). Plaintiff originally asserted claims against Rockrose for specific performance of the PSA (first cause of action), breach of the NDA (fourth cause of action), unjust enrichment (fifth cause of action), tortious interference with the PSA (sixth cause of action), and declaratory judgment for attorney's fees (ninth cause of action).

By decision and order dated December 15, 2023, Justice Barry Ostrager denied both Rockroses's and the College's motions to dismiss, in part (*see* 12/15/23 decision and order [NYSCEF Doc No. 53]). As against Rockrose, plaintiff's claims for specific performance of the PSA (first cause of action), breach of the NDA (fourth cause of action) and tortious interference with the PSA (sixth cause of action) survived (*see id*.). Plaintiff's claims as against the College for breach of the PSA and specific performance also survived (*see id*.).

On May 13, 2025, Plaintiff and the College entered into a confidential settlement agreement (NYSCEF Doc No. 515). On June 5, 2025, the parties stipulated to the voluntary discontinuance of all claims between plaintiff and the College (NYSCEF Doc No. 185).

On June 5, 2025, Rockrose moved for leave to supplement the record on this motion for summary judgment to include three fact affirmations by the following individuals that former defendant the College would have submitted on its own motion for summary judgment – Thomas

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No. 015

Page 24 of 44

[* 24]

Cecere, the College's current president; John Thomas, a real-estate attorney who represented the College in the transaction; and Robert Castillo, a surveyor with BLD Land Surveyors LLP, a land survey company that Fidelity engaged to prepare a title survey in connection with the transaction (*see* NYSCEF Doc No. 336 [motion sequence no. 014]).

By decision and order dated July 7, 2025 (NYSCEF Doc No. 542), this court granted the motion and permitted defendants to supplement the record "for the limited purpose of corroborating defendants' existing factual assertions and clarifying whether plaintiff was ready, willing and able to close, as stated by the three College-aligned affiants" (*id*. at 2).

## DISCUSSION

"Because summary judgment is a drastic measure that deprives a party of her day in court, it may be granted only if no genuine triable issue of fact is presented" (*Grossman v Amalgamated Hous. Corp.*, 298 AD2d 224, 226 [1st Dept 2002]). On a summary judgment motion, the "facts must be viewed in the light most favorable to the plaintiff, and every available inference must be drawn in the plaintiff's favor" (*De Lourdes Torres v Jones*, 26 NY3d 742, 763 [2016]). The moving party bears the burden of establishing "'a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact'" (*William J. Jenack Estate Appraisers & Auctioneers, Inc. v Rabizadeh*, 22 NY3d 470, 475 [2013], quoting *Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]). "Where the moving party fails to meet this burden, summary judgment cannot be granted, and the non-moving party bears no burden to otherwise persuade the court against summary judgment" (*id*.). Moreover, if the moving party makes a prima facie case for summary judgment, summary judgment cannot be granted when the non-movant produces evidentiary proof sufficient to establish the existence of triable issues of material fact (*Flanders v Goodfellow*, 44 NY3d 57, 63 [2025]). If there is "any

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No. 015

Page 25 of 44

25 of 44

[* 25]

doubt as to the existence of a triable issue, the motion should be denied" (*Grossman*, 298 AD2d at 226).

In support of its motion for summary judgment dismissing the remaining causes of action asserted as against it, Rockrose argues that that, as of the time of the essence closing date, 180 Remsen had not secured the funding necessary to pay the purchase price and, therefore, was not ready, willing, and able to close the transaction. According to Rockrose, this simple fact entitles defendants to summary judgment dismissing this action in its entirety because it precludes 180 Remsen's claim for specific performance and was the but-for cause of any financial harm 180 Remsen suffered. Defendants further argue that, likewise, the College's lawful termination of its contract with 180 Remsen, after 180 Remsen's default, is fatal to its claims for tortious interference, and for breach of the NDA.

**Specific Performance (First Cause of Action)**

Specific performance is an equitable remedy for breach of contract reserved for instances when money damages would be inadequate to protect the "'expectation interest of the injured party'" and "'performance will not impose a disproportionate or inequitable burden on the breaching party'" (*Cho v 401-403 57th Street Realty Corp.*, 300 AD2d 174, 175 [1st Dept 2002], quoting citing Restatement [Second] of Contracts §§ 359, 364 [1] [b]; *Van Wagner Advertising Corp. v S & M Enterprises*, 67 NY2d 186, 193 [1986]). The right to specific performance is not automatic, and "[t]he decision whether or not to award specific performance is one that rests in the sound discretion of the trial court" (*Sokoloff v Harriman Estates Dev. Corp.*, 96 NY2d 409, 415 [2001]).

A buyer seeking specific performance of a real estate contract with a duly noticed "time is of the essence" closing date must prove that it substantially performed its obligations under the

contract, that it tendered performance or was "ready, willing, and able" to close on such date, and that the seller was able to convey the property (*Sonnenschein v 1986-F&S of N.Y., Ltd.*, 217 AD3d 487, 487 [1st Dept 2023]). A defendant is entitled to judgment dismissing a specific performance claim where the plaintiff purchaser "submit[s] no evidence of its financial ability to pay the balance of the purchase price" (*3801 Review Realty LLC v Review Realty Co. LLC*, 111 AD3d 509, 509-510 [1st Dept 2013]). Likewise, "[p]laintiff's inability to demonstrate that it was ready, willing and able to fulfill its contractual obligations at closing also precludes it from recovering money damages" (*id.* at 510; *see also Pesa v Yoma Dev. Group, Inc.*, 18 NY3d 527, 531-532 [2012] [purchaser seeking damages for vendor's purported repudiation of a contract to sell real property must show it was ready, willing and able to close the transaction]; *Ward Capital Mgt. LLC v New Pelham Parkway N. LLC*, 165 AD3d 477, 478 [1st Dept 2018] ["Since the real estate contract provided that the time of closing is of the essence, performance on the specified date was a material element and plaintiff's failure to perform on that date constituted material breach"]).

Conversely, a defendant "moving for summary judgment dismissing a cause of action for specific performance of a contract for the sale of real property has the burden of demonstrating the absence of a triable issue of fact regarding whether the plaintiff buyer was ready, willing and able to close" (*Fink v 218 Hamilton LLC*, 233 AD3d 649, 651 [2d Dept 2024]). In addition, the defendant must demonstrate, *prima facie*, that the buyer was in default (*see Ashkenzi v Miller*, 190 AD3d 668 [2d Dept 2021]).

Moreover, specific performance can be enforced against a third-party buyer who was on notice of another buyer's contract rights to the property (*see* NY Real Prop Law § 294 [3]; *Newpar Estates, Inc. v Barilla*, 4 AD2d 186, 188 [1st Dept 1957]; *see also Pollack v Viele*, 273 AD 871, 871 [2d Dept 1948] [decreeing that appellant, a non-bona fide buyer "who had actual knowledge

653148/2023  180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No.  015

Page 27 of 44

of respondent's prior contract of purchase," "perform the contract"], *affd* 298 NY 670 [1948]; *Chen v Geranium Dev. Corp.*, 243 AD2d 708, 709 [2d Dept 1997] [a subsequent buyer is not a bona fide buyer if it relied on a "bare representation" by the seller that prior contracts for the property "had been cancelled"]; *Morrocoy Marina, Inc. v Altengarten*, 120 AD2d 500, 500 [2d Dept 1986] ["It is not necessary to show that the third party knowingly interfered with a valid contract in order to grant specific performance against him. ... It would be sufficient if he had knowledge of facts that would lead a reasonably prudent purchaser to make inquiry and he failed to do so"] [quotation marks and citations omitted]).

Defendants' primary contention is that plaintiff may not seek specific performance of the PSA because it was not ready, willing and able to perform on or before the closing date. According to defendants, 180 Remsen confirmed in discovery that it had not secured a single commitment to fund the balance of the purchase price as of March 30, 2023, did not have the funds in hand needed to close on March 30, 2023, and therefore was not ready, willing, and able to close.

However, in opposition, plaintiff presents evidence raising issues of fact as to whether it was financially prepared to close on the closing date, and thus, whether it was ready, willing and able to close (*see 534 Flatbush Holdings, LLC v Solaris Props., LLC*, 234 AD3d 732, 734 [2d 2025] ["triable issues of fact existed, inter alia, as to whether 534 Holding Corp. was able to satisfy the subject conditions in the contract ... so as to be entitled to specific performance of the contract"]).

First, 180 Remsen presents evidence that it had several avenues of funding the balance of the purchase price by the scheduled closing date, because it was in advanced discussions with several institutional investors and could have finalized a deal with them in as little as one day, if necessary. 180 Remsen submits the affidavit of Eric H. Sussman, a real estate expert, professor,

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No. 015

Page 28 of 44

28 of 44

and practitioner [NYSCEF Doc No. 533]), who opines that 180 Remsen would have been able to pay for its purchase of the Property if the parties had reached closing under the PSA (*id*., ¶ 54). Sussman avers that 180 Remsen had previously deposited $10 million into escrow towards the $180 million purchase price, and that "[b]ased on my review of the record and the interviews I have conducted, it is my opinion that 180 Remsen was positioned to obtain the remaining $170 million by the time the parties reached closing" (*id*., ¶ 55). According to Sussman, it would have been "consistent with industry practice for 180 Remsen to have, in a matter of days, secured financing through the significant number of potential investors and capital partners with whom Avison Young was in discussions" (*id*., ¶ 56).

Sussman also asserts that "180 Remsen was holding out for a financing deal that would ensure the most favorable long-term returns, even if doing so meant a lengthier negotiation period," and that, "[i]t is my opinion that, in opting not to sacrifice favorable financing terms, 180 Remsen acted consistently with a prudent developer facing similar circumstances" (*id*., ¶ 57). Sussman further asserts that, "[a]t the same time, it is also my understanding that, had the parties reached closing under the PSA, 180 Remsen would have been willing to agree to less favorable financing terms in order to secure the necessary funds to purchase the Property and close escrow," which "too, is the approach a prudent developer in 180 Remsen's position would take" (*id*., ¶ 58). Sussman emphasizes that, although "180 Remsen had not formally secured financing from one of the potential investors with whom Avison Young was engaged as of March 30, 2023," "they could have secured such financing by the time closing was reached," and that "[i]t is not uncommon in the industry for financing to be finalized in short order, especially when negotiations and due diligence has already been underway for some time" (*id*.).

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No.  015

Page 29 of 44

29 of 44

Sussman also stated that he interviewed Elias, and reviewed his deposition transcript and the documents that he produced. Sussman opines that Elias' "statements, testimony, and documents reflect that he was committed and financially able to provide up to $25 million in equity in order to close on the acquisition of the Property had closing been reached," which "amount would have offset the amount needed from an institutional investor, which may have facilitated a financing deal" (*id*., ¶ 59).

Accordingly, plaintiff has produced evidence regarding its potential ability to close, thus raising issues of fact as to whether it was ready, willing and able to close on the closing date (*see e.g. Kugel v Reynolds*, 228 AD3d 743, 749 [2d Dept 2024] [defendants "failed to demonstrate the absence of triable issues of fact as to whether the plaintiffs were not ready, willing, and able to close," precluding dismissal of specific performance claim]; *Guzman v Ramos*, 191 AD3d 644, 648 [2d Dept 2021] ["the defendant failed to demonstrate the absence of a triable issue of fact as to whether the plaintiff was ready, willing, and able to purchase the subject property" where the plaintiff testified that "she had obtained sufficient funding to close from an alternative source"]; *1107 Putnam, LLC v Beulah Church of God in Christ Jesus of Apostolic Faith, Inc.*, 152 AD3d 474, 475 [2d Dept 2017] [denying summary judgment motion where there were genuine issues of triable fact as to whether the defendant was "able to deliver marketable title pursuant to the terms of the parties' contract" and whether plaintiff "defaulted by refusing to close without the removal of titled defects"]; *see also Metropolitan Prop. & Cas. Ins. Co. v Pentair Residential Filtration, LLC*, 242 AD3d 513, 514 [1st Dept 2025] [finding that an expert affidavit "is sufficient to raise an issue of fact"]).

Defendants also argue that, because specific performance is an equitable remedy for a breach of contract, dismissal of a plaintiff's breach of contract cause of action necessarily

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No. 015

Page 30 of 44

[* 30]

precludes any award of specific performance. Thus, defendants contend, because 180 Remsen has discontinued its claim for breach of the PSA against the College, with prejudice, and has released the College from any claims arising under the PSA from the beginning of time, it cannot assert that the PSA was breached, and thus, may not seek the equitable remedy of specific performance for a breach of the PSA.

The court rejects this argument. In settling with the College, plaintiff did not make any concessions about the merits of its claims or waive any rights against defendants (*see* settlement agreement, §§ 4, 13). Moreover, it is irrelevant that no breach of contract claim is pending, because a seller of property is not a necessary party in an action for specific performance against a subsequent purchaser (*see e.g. Nagavi v Newcomb*, 305 AD2d 904, 906-907 [3d Dept 2003]).

Accordingly, defendants' motion to dismiss the specific performance cause of action is denied.

**Tortious Interference with the PSA (Sixth Cause of Action)**

"A claim of tortious interference with contract requires the establishment of four elements: '(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach; and (4) damages'" (*DeLibero v Duloc*, 199 AD3d 600, 600 [1st Dept 2021] [citation omitted]; *see also Lama Holding Co. v Smith Barney Inc.*, 88 NY2d 413, 424 [1996]). The failure to establish breach of contract "precludes ... claims for tortious interference" (*Oddo Asset Mgt. v Barclays Bank PLC*, 19 NY3d 584, 586 [2012]; *see Warburg Realty Partnership, Ltd. v Aschheim*, 220 AD3d 555, 556-557 [1st Dept 2023]).

Defendants argue that the tortious interference claim should be dismissed because (1) the College did not breach the PSA; (2) defendants did not intentionally induce any breaches of the

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No.  015
Page 31 of 44

31 of 44

PSA; and (3) plaintiff cannot prove "but-for" damages. Notably, defendants never argued economic justification (*Ford Motor Credit Co. LLC v McCarthy Acquisition Corp.*, 217 AD3d 1480 [4th Dept 2023]).

### 1. Breach of the PSA

Rockrose argues that the College did not breach the PSA but, rather, properly terminated it because 180 Remsen itself breached the PSA by failing to close, or to tender the balance of the $180 million purchase price. However, as previously discussed, there is an issue of fact as to whether plaintiff was ready, able and willing to close, and thus, whether it breached the PSA. Moreover, in opposition, plaintiff contends that the College breached several provisions of the PSA. Accordingly, as more fully set forth below, there are issues of fact as to whether plaintiff or the College breached the PSA.

### A.      The College's Alleged Breaches of Certain Provisions of the PSA

The "[i]nterpretation of unambiguous contracts is a question of law and a proper function of the court on a motion for summary judgment" (*301 E. 60th St. LLC v Competitive Solutions. LLC*, 217 AD3d 79, 84 [1st Dept 2023]). However, if any "term or clause is ambiguous and the determination of the parties' intent depends upon the credibility of extrinsic evidence or a choice among inferences to be drawn from extrinsic evidence, then the issue is one of fact" (*Amusement Bus. Underwriters v American Intl. Group, Inc.*, 66 NY2d 878, 880 [1985]; *see also Hartford Acc. & Indem. Co. v Wesolowski*, 33 NY2d 169, 172 [1973]). Thus, under settled principles of contract interpretation, where the parties to a contract disagree as to the interpretation and meaning of the contractual provisions at issue, summary judgment must be denied (*see Noho Lighting & Elec. Supply Co. v Simon*, 45 AD3d 391, 392 [1st Dept 2007]; *see also Biotronik A.G. v Conor Medsystems Ireland, Ltd.*, 117 AD3d 551, 553 [1st Dept 2014] [denying summary judgment due

to "issues of fact and of contract interpretation ... that must be resolved in order to determine whether defendants breached the contract"]).

First, plaintiff points to the College's covenant not to "engage in any activity or effect any transaction with respect to the Property which is outside the normal course of business of the Seller" (PSA, § 7.1.4 [c]). "Something which is [not] done as a matter of corporate historical practice is, as a matter of law, [not] done in the ordinary course of business" (*Unisys Corp. v Hercules Inc.*, 224 AD2d 365, 368 [1st Dept 1996]). Plaintiff points to various evidence to demonstrate that negotiating and signing the Backup PSA was outside the College's normal course of business.

The issue of whether or not the Backup PSA was outside the College's normal course of business is a red herring. Whether it was or was not cannot be the reason this transaction failed. Plaintiff has not shown it could possibly have suffered damage from any breach of this provision. Either plaintiff properly abstained from closing because it had a proper title objection, or it did not. In the latter case, the College would have been within its rights to terminate.

Plaintiff next argues that the College's negotiations with Rockrose, and its execution of the Backup PSA, breached the College's commitment not to contract with a back-up buyer. In the PSA, the College represented that it had not entered into any agreements granting an entity "the right to purchase ... all or any part of the Property" (PSA, § 6.2.5). The College also agreed not to "take any action that would cause any of Seller's Representations herein to become materially inaccurate as of the Closing" (*id.*, § 7.1.4 [i]). Plaintiff argues that, by signing the Backup PSA, the College rendered its representation under section 6.2.5 false by giving BK Acquisition a "right to purchase ... the Property" (*id.*, § 6.2.5).

**653148/2023  180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL**  **Page 33 of 44**
**Motion No.  015**

33 of 44

Defendants contest plaintiff's interpretation, arguing that section 6.2.5 "clearly was intended to prevent the College from encumbering the Property prior to closing in a manner that would impair the value of the Property or limit 180 Remsen's property rights", and that "[t]he College, by entering into a Backup PSA that was expressly contingent upon 180 Remsen's failure to perform on the TOE Closing Date, did nothing of the sort" (Rockrose reply memorandum, [NYSCEF Doc No. 583], at 22-23). Defendants also argue that they did not receive an absolute "right" to purchase the Property because the Backup PSA was ostensibly conditioned on 180 Remsen's non-closure under the PSA. The parties' differing interpretations of this section also create issue of fact, requiring denial of the motion (*see Biotronik A.G.*, 117 AD3d at 553).

Plaintiff further argues that the College breached the PSA by failing to follow the title objection procedures, and then improperly attempting to terminate the PSA. The PSA set forth specific procedures for responding to a title objection:

> "With respect to any title objections as to which Buyer has timely objected pursuant to Section 3.1.1 (a) that are not Required Removal Exceptions, Seller may elect (but shall not be obligated) to Remove or cause to be Removed any such exceptions to title and Seller may notify Buyer in writing not later than seven (7) calendar days after receipt of Buyer's notice of Buyer's title objections (but, in any event, prior to the Scheduled Closing Date) whether Seller elects to Remove the same. Failure of Seller to respond in writing within such period shall be deemed an election by Seller to not Remove such title objections"

(PSA, § 3.1.1 [b]). Thus, upon receipt of a title objection, the College had to elect to remove, or elect not to remove, plaintiff's title objection (*id*.). Plaintiff argues that, however, the College's March 30, 2023 response to plaintiff's title objection did not make an election and that, even after plaintiff explained that the March 30 Title Commitment did not resolve its title objection, the College still did not clarify whether it was electing to remove the objection, notwithstanding that Fidelity indicated that it was working to resolve the basis for the objection. Plaintiff contends that, instead, the College attempted to terminate the PSA, but that this attempt was improper. The PSA

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No.  015

Page 34 of 44

34 of 44

provides that the College may terminate the PSA only upon "the satisfaction of all conditions to [180 Remsen's] obligation to close" (PSA, § 8.1). Plaintiff contends that 180 Remsen's conditions precedent were not all met.

First, plaintiff argues, the condition precedent under Section 5.4 (a) of the PSA, that requires Fidelity to issue a title policy subject only to the Permitted Exceptions, was not met because the title commitment did not unambiguously insure title to the Unrestricted Areas (*id*., §§ 3.1.2, 5.4 [a]). Second, the condition precedent under Section 5.4 (b) of the PSA, which requires the College to perform its material obligations under the PSA, was not met because the College had not complied with the title objection procedures. Third, the condition precedent under Section 5.4 (c) of the PSA, that requires all of the College's representations remain true, was not met because the entry into the Backup PSA rendered false the no-third-party-agreements representation under Section 6.2.5 (PSA, §§ 5.4 [c], 6.2.5). Thus, plaintiff argues, defendants' argument that the College was permitted to terminate the PSA because 180 Remsen failed to close on March 30 is without merit.

## B. Plaintiff's Title Objection

Apart from whether the College followed the PSA's procedures with respect to a title objection, Rockrose attacks plaintiff's title objection itself. Rockrose argues that plaintiff's objection to the setback restriction on date of closing was not a valid objection, but rather, was manufactured and merely a pretext to essentially hold up the College on the eve of closing, and force it to renegotiate the PSA. Specifically, Rockrose contends that the Setback Restriction could not be the basis for a valid title objection under the PSA because 180 Remsen was aware of a continuous setback restriction on Remsen Street before signing the PSA, and then stipulated to it in the PSA Second Amendment, as surveys referenced in both agreements contained a dashed line

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL       Page 35 of 44
Motion No.  015

35 of 44

running along part of Remsen Street. Rockrose contends that, thus, 180 Remsen was not, and could not have been, "surprised" by the applicability of the Setback Restriction to the entirety of Remsen Street. Rockrose argues that, accordingly, this invalid title objection did not absolve 180 Remsen of its obligation to close on the closing date.

However, plaintiff's submissions raise issues of fact as to the extent of the setback restriction, whether it was continuous on the entirety of Remsen Street, and thus whether it was a valid title objection. According to plaintiffs, the PSA reflects the parties' shared understanding that there was no Setback Restriction on the Unrestricted Areas because the definition of Permitted Exceptions listed deeds with setback restrictions that only affected the Restricted Areas (*see* PSA, Article 1-Certain Definitions, "Permitted Exceptions" listing various deeds). Plaintiff further contends that the dashed line in the surveys (including the one attached to the PSA) was not evidence of a continuous Setback Restriction, but rather, was just a dashed line based on, as the survey said, prior surveys, not the title record. Indeed, the surveys said they did not reflect any restrictions on the Property, and the one referenced in the PSA Second Amendment identified the only Setback Restriction with page and liber numbers.

Plaintiff further contends that, thus, when Fidelity revealed right before closing that it believed the dashed line was an exception to title, despite that the dashed line had never before been described as an exception to title, and then amended the title commitment to reflect that opinion, this was a new title matter to which 180 Remsen was entitled to object (*see* PSA, § 3.1.1 [a]).

Plaintiff also argues that the title objection was not resolved when Fidelity removed paragraph 4 (l) in the March 30 Title Commitment. According to plaintiff, the March 30 Title Commitment remained ambiguous as to whether it insured title to the Unrestricted Areas,

653148/2023  180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL                    Page 36 of 44
Motion No.  015

36 of 44

including because it incorporated the survey reading as part of the exceptions to title in Schedule B (a change from the November 2022 title commitment referenced in the PSA Second Amendment, meaning 180 Remsen was entitled to object to the change in the commitment). Thus, the only way to remove the basis for 180 Remsen's objection was for Fidelity to issue a title commitment that affirmatively indicated the Unrestricted Areas were insured.

Although Rockrose argues there is no material dispute of fact regarding the extent of the Setback Restriction, it cites no real evidence to support its claim that 180 Remsen already knew, even before it executed the PSA, that the Setback Restriction is continuous across the entirely of Remsen Street, and includes the Unrestricted Areas. Rather, it relies on <u>disputed</u> material facts set forth in the College's affirmations (*see* Thomas affirmation, ¶ 7 ["While Alexico claimed to have 'recently discovered'" the Setback Restriction, it was the product of recorded restrictions in deeds dating back to the 1800's, identifiable through a basic due diligence title search and specifically referenced under 'Permitted Exceptions' in the initial draft purchase and sale agreement that was shared with Buyer's Counsel in December 2021"]; *id.*, ¶ 23 [180 Remsen stipulated to the December 2022 Pro Forma and the survey when the parties agreed to the Second Amendment to the PSA]; Castillo affirmation, ¶ 4 ["The March 28, 2022 Survey, annexed hereto as Exhibit 'A,' depicts an 8-foot setback restriction (identified with the words 'Restriction Line'), which runs along the entire northerly portion (Remsen Street) of the Property"]; *id.*, ¶ 6 ["the March 27, 2023 Survey contains the same 8-foot setback restriction as depicted in the March 28, 2022 Survey (identified with the words 'Restriction Line'), which runs along the entire northerly portion (Remsen Street) of the Property"]; *see also* Cecere affirmation, ¶ 45).

Moreover, there is evidence in the record that both Rockrose and the College have consistently treated the Setback Restriction as non-continuous. First, the College built permanent

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Page 37 of 44
Motion No. 015

37 of 44

structures in the Unrestricted Areas (*see* Martinez-Saenz dep, at 193:22; *see also* Bahar affirmation, ¶ 8 [Fidelity initially "agreed that there were no setback restrictions in the title record affecting the Unrestricted Areas," "the College also agreed that the Unrestricted Areas were in fact unrestricted," and "the College had already built into one of the Unrestricted Areas"]). Elghanayan, Rockrose's president, also testified that "from the beginning of the acquisition process," i.e., before plaintiff's title objection, Rockrose understood that "[t]he building to the east of the landmark building," (one of the unrestricted lots) "did not have the setback requirement" (*see* Elghanayan dep, at 199:2-24). This evidence completely contradicts the assertions in the supplemental affirmations claiming that the Setback Restriction was known to be continuous.

Accordingly, there are issues of fact as to whether plaintiff had a valid title objection relieving it of its obligation to perform on the closing date, and ultimately, whether the PSA was breached, either by the College or 180 Remsen.

### 2. Intentional Inducement

Rockrose also argues that plaintiff cannot establish its claim for tortious interference because there is no evidence of its tortious intent. On a claim for tortious interference with contract, a plaintiff must show that a defendant "intentionally and improperly" caused a third party to breach a contract (*White Plains Coat & Apron Co. v Cintas Corp.*, 8 NY3d 422, 425 [2007]). A plaintiff need not show, however, that "the defendant was engaged in [un]lawful behavior" (*Carvel Corp. v Noonan*, 3 NY3d 182, 190 [2004]). The question is whether the conduct exceeded "'a minimum level of ethical behavior in the marketplace'" (*White Plains*, 8 NY3d at 427 [2007] [citation omitted]). "[M]ere status as plaintiff's competitor is not a legal or financial stake in the breaching party's business that permits defendant's inducement of a breach of contract" (*id*. at 426).

**653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL**
**Motion No.  015**

**Page 38 of 44**

Although proof of actual knowledge of the contract is required for tortious interference of contract, such proof can be "predicated upon circumstantial evidence" (*Roulette Records v Princess Prod. Corp.*, 15 AD2d 335, 338 [1st Dept 1962], *affd* 12 NY2d 815 [1962]).  As with knowledge, intent of the parties may be inferred based on all of the facts and circumstances (*Suri v Grey Global Group, Inc.*, 164 AD3d 108, 116 [1st Dept 2018] ["'if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper'"] [citation omitted]; *Macnish-Lenox, LLC v Simpson*, 17 Misc 3d 1118[A], 2007 NY Slip Op 52055[U], * 16 [Sup Ct, Kings County 2007]). Making an offer of better terms with the intent of persuading a breach is enough to impose liability (*Gold Medal Farms, Inc. v Rutland County Co-op. Creamery, Inc.*, 9 AD2d 473, 479 [3d Dept 1959] [finding sufficient evidence for a jury to infer defendants intended to bring about a breach]). In addition, persuasion to breach, alone, has been found sufficient to impose liability (*see Guard-Life Corp. v S. Parker Hardware Mfg. Corp.*, 50 NY2d 183, 194 [1980]).

Although there is no direct evidence that Rockrose intentionally interfered with the PSA, plaintiff presents circumstantial evidence sufficient to raise issues of fact as to whether defendants intended to induce the College's alleged breach of the PSA.  For instance, the fact that defendants initiated contact with the College about buying the Property, knowing that both the College and 180 Remsen were up against a deadline, and seemingly misrepresented to the College that the NDA permitted Rockrose to transact with the College (*see* Martinez-Saenz dep, at 306:2-17; *see also* 3/26/23 email [rejecting College's request to review the NDA to evaluate its exposure]), raises issues of fact as to whether defendants intended to procure a breach of the PSA, and whether their actions caused the College to breach the normal-course covenant and the no-third-party agreements representation.

[* 39]

Defendants also argue that they could not have intentionally interfered with the PSA because the Backup PSA included a representation (drafted by Rockrose) that the College told Rockrose the PSA did not prevent the College from engaging a back-up buyer:

> "The Existing Contract does not prohibit [the College] from entering into this Agreement. Prior to entering into negotiations with [BK Acquisition] for the sale of the Property, [the College] has disclosed, to [180 Remsen] that [the College] may pursue backup contracts for the sale of the Property in case the closing under the Existing Contract does not occur on the Existing Contract Closing Date. A copy of the Existing Contract has not been made available to [BK Acquisition] by [the College]"

(Backup PSA, § 6.2.19).

However, a plaintiff is not required to show that defendants had "full knowledge of the detailed terms" of the agreement (*Gold Medal Farms,* 9 AD2d at 478; *see also Hidden Brook Air, Inc. v Thabet Aviation Intl. Inc.*, 241 F Supp2d 246, 279 [SD NY 2002]). Rather, what matters is whether defendants knew about the existence of the PSA, not its specific terms (*see Guard-Life Corp.*, 50 NY2d at 193 ["While it must be established, as a threshold predicate for any claim of tortious interference, that the alleged tort-feasor knew that his competitor had a contract with the third party, as a practical matter he will usually be totally unaware of, and customarily indifferent to, the legal particulars of that contract"]).

In any event, Elghanayan testified that Rockrose did not review the PSA, or verify whether that representation was correct (Elghanayan dep, at 140:12-141:13). He further testified that he was aware that Rockrose was inviting a lawsuit by purchasing the Property (*see* Elghanayan dep, at 157:12-160:2, 165:25-166:10; *see also* tr of 4/9/25 court hearing [NYSCEF Doc No. 476], at 16:5-7), but decided that the opportunity to purchase the "[i]rreplaceable" Property was worth the risk (*see* 11/4/22 email from Elghanayan to Paul Januszewski and Patricia Dunphy of Rockrose). Moreover, Brancato testified that the terms of the PSA were simply not "relevant" to Rockrose

[* 40]

(*see* Brancato dep, at 203:22-204:21). This testamentary and documentary evidence raises issues of fact as to whether this conduct was plainly below "a minimum level of ethical behavior in the marketplace" (*White Plains*, 8 NY3d at 427).

### 3. Damages

Defendants next argue that plaintiff cannot prove the damages element of its tortious interference claim because the "proximate cause" of its losses was plaintiff allegedly not being financially prepared to close on the scheduled closing date, which caused the College to terminate the PSA. Defendants argue that, because 180 Remsen was financially unable to close on closing date, the transaction would have failed, and 180 Remsen would have suffered its claimed damages, regardless of whether the College breached.

However, "[a] cognizable claim for tortious interference does not require an allegation that the defendant's conduct was the sole proximate cause of the alleged harm" (*Kronish Lieb Weiner & Hellman LLP v Tahari, Ltd.*, 35 AD3d 317, 318 [1st Dept 2006]). Moreover, as previously discussed, plaintiff has presented an issue of fact as to whether it would have had the funds required on the closing date to close the transaction. The record reflects an issue of fact that, as of the scheduled closing date, 180 Remsen was in advanced discussions with several institutional investors, and likely could have finalized a deal with them in as little as one day if it was necessary. Elias also had millions of dollars on hand to contribute to closing, that could have offset the amount needed from institutional investors. Plaintiff asserts that, as such, 180 Remsen would have been able to close on March 30, 2023 if the College adequately addressed the title objection.

In any event, to prove causation, 180 Remsen does not need to show that it was ready to close on the scheduled closing date. Rather, what matters is that Rockrose was the but-for cause of plaintiff's harm, i.e., the loss of the Property (*see Rich v Fox News Network, LLC*, 939 F3d 112,

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No. 015

Page 41 of 44

41 of 44

128 [2d Cir 2019] ["Under New York law, for tortious interference with contract, the elements of damages ... [are] those recognized under the more liberal rules applicable to tort actions.... One who is liable to another for interference with a contract ... is liable for damages for [] the pecuniary loss of the benefits of the contract or the prospective relation"] [quotation marks and citations omitted]). Plaintiff contends that its loss of the Property was caused by defendants because, absent Rockrose serving as a "back-up" buyer, plaintiff and the College would have closed on their deal, especially given the undisputed fact that the College was eager to close as soon as possible because it was worried about upcoming debt obligations and cash flow shortages. Indeed, Martinez-Saenz testified that, if Rockrose was not available as a buyer, 180 Remsen would have been the only one available, because the College had no other options (*see* Martinez-Saenz dep, at 289:5-290:4).

Accordingly, plaintiff has raised triable issues of fact as to the key elements of its tortious breach of contract claim that defeat summary judgment (*see MUFG Bank, N.A.*, 68 Misc 3d 1229[A], 2020 NY Slip Op 51101[U] at * 6).

**Breach of the NDA (Fourth Cause of Action)**

Plaintiff contends that defendants breached the NDA when they used the Evaluation Material to negotiate with the College, and ultimately purchase the Property. Plaintiffs further contend that those breaches caused 180 Remsen to lose the Property.

Defendants first argue that the court need not reach the issue of whether there was a technical breach of the NDA, because 180 Remsen cannot prove an essential element of its claim— that defendant's breach of the NDA was the but-for cause of 180 Remsen's damages. The court rejects this argument, as it is entirely possible that, absent defendants' alleged breaches of the NDA, they would not have been available as a buyer, or entered into the Backup PSA. In that case, plaintiff might have closed with the College. In any event, "'[n]ominal damages are always

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No.  015

Page 42 of 44

42 of 44

available in breach of contract actions'" (*NGM Mgt. Group, LLC v Bareburger Group, LLC*, 224 AD3d 600, 602 [1st Dept 2024] [citation omitted]).  180 Remsen is also entitled to attorneys' fees under the NDA (*see e.g. Quik Park W. 57 LLC v Bridgewater Operating Corp.*, 232 AD3d 483, 483-84 [1st Dept 2024] ["Contrary to defendant's contention, a prevailing party, even if only able to show nominal damages, can assert claims for attorneys' fees pursuant to the parties' agreement]).

There is also an issue of fact as to what the term "Transaction" in the NDA refers to. Pursuant to the NDA, defendants are prohibited from disclosing the Evaluation Material relating to the Transaction to third parties, or discussing the Transaction with third parties.  Defendants assert that the NDA was not breached because the term "Transaction" in the NDA refers to the potential transaction between RRDC and 180 Remsen to partner in pursuing 180 Remsen's development plan, and that thus, they were permitted to engage in other transactions concerning the Property, like their purchase of the Property under the Backup PSA.

Plaintiff, however, has a completely different interpretation of this term, arguing that, given the context—where 180 Remsen had a signed contract to purchase the Property—the definition of Transaction clearly refers to 180 Remsen's anticipated purchase of the Property.  Plaintiff also points to the definition of "Transaction" in the NDA, which, on its face, is contrary to defendants' interpretation (*see* NDA, first WHEREAS clause [defining Transaction as "a potential transaction at 185 Joralemon Street, Brooklyn, New York and 180 Remsen Street, Brooklyn, New York"]).

Given these differing interpretations as to the meaning of the term Transaction, there are clearly issues of fact as to whether the NDA was breached (*see Advanced Aerofoil Tech., AG v MissionPoint Capital Partners LLC*, 170 AD3d 460, 461 [1st Dept 2019] [denying summary

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No.  015

Page 43 of 44

[* 43]

judgment because issue of fact existed as to the term "'confidential advisor'" within the meaning of the NDA"]).

The court has considered the parties' remaining arguments, and finds them unavailing.

Accordingly, it is

ORDERED that defendant Rockrose's motion for summary judgment dismissing the complaint is denied; and it is further

ORDERED that the parties are to appear for a pretrial conference over Microsoft Teams on March 11, 2026 at 11 a.m.

20260303185818MACRANE9A182BBE379C418FBE29CCF47EC214F1

| 3/3/2026 | | | |
|----------|--|--|--|
| **DATE** | | | **MELISSA A. CRANE, J.S.C.** |

CHECK ONE: ☐ CASE DISPOSED ☒ NON-FINAL DISPOSITION

☐ GRANTED ☒ DENIED ☐ GRANTED IN PART ☐ OTHER

APPLICATION: ☐ SETTLE ORDER ☐ SUBMIT ORDER

CHECK IF APPROPRIATE: ☐ INCLUDES TRANSFER/REASSIGN ☐ FIDUCIARY APPOINTMENT ☐ REFERENCE

653148/2023   180 REMSEN LLC vs. ST. FRANCIS COLLEGE ET AL
Motion No. 015

Page 44 of 44